Emily HSU, By and Through her next friend, Dr. Chin–Ching HSU, Timothy Hsu, By and Through his next friend, Dr. Chin–Ching Hsu, Plaintiffs,

v.

ROSLYN UNION FREE SCHOOL DISTRICT NO. 3, et al., Defendants.

No. CV 94–0659.

United States District Court, E.D. New York.

Feb. 21, 1995.

---

Migliore & Infranco, P.C. by Joseph P. Infranco, Commack, NY, for plaintiffs.

Jaspan Ginsberg Schlesinger Silverman & Hoffman by Stanley A. Camhi, Garden City, NY, for defendants.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Plaintiffs Emily Hsu and Timothy Hsu, students at Roslyn High School, through their parent and guardian Dr. Chin–Ching Hsu, bring this action against defendants Roslyn Union Free School District No. 3 (the "School District"), the President, Vice–President and the other members of the School District's Board of Education (the "School Board") in their official capacities, the Superintendent and Assistant Superintendent of the School District in their official capacities, and the present and former Principals of Roslyn High School in their official capacities, for injunctive, declaratory, and monetary relief challenging enforcement of defendants' policy prohibiting discrimination on the basis of religion as applied to a student bible club organized by plaintiffs. Plaintiffs allege that the School District's nondiscrimination policy, as applied to the bible club in the form of an "open officership" requirement, violates plaintiffs' rights under the Equal Access Act ("EAA" or the "Act"), 20 U.S.C. § 4071 *et seq.*, the First and Fourteenth Amendments of the United States Constitution, and the recently-enacted Religious Freedom Restoration Act of 1993 ("RFRA"), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.*, as well as the New York State Constitution. Presently before the Court are plaintiffs' motion for a preliminary injunction to prevent defendants from enforcing the nondiscrimination policy, and defendants' cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## I. *BACKGROUND*

The facts as alleged in plaintiffs' 38–page amended complaint and plaintiffs' affidavits are summarized as follows. When this action was commenced, plaintiffs Emily Hsu and Timothy Hsu were students of Roslyn High School, a public high school for grades nine through twelve located in Roslyn, New York, within the defendant School District. Amended Complaint ¶¶ 7, 9, 21. Emily Hsu presumably has graduated since that time [1]; Timothy Hsu has not. The school is controlled and operated under the authority of the School Board, and receives federal financial assistance. *Id.* ¶ 21. Defendants permit student groups to voluntarily meet on school premises during noninstructional time. *Id.* ¶¶ 1, 22. Plaintiffs identify nearly three dozen clubs meeting on the school's premises with recognition by defendants, including, for example, the Chess Club, Art Club, Math Club, Mock Trial, Key Club, Fashion Club, Peer Counseling, Model Congress, and Jazz Band. *Id.* ¶ 22. While many of these clubs are curriculum related, some are noncurriculum related. *Id.* Each of these recognized clubs is granted certain rights and privileges, including access to meeting areas and the right to advertise. *Id.* ¶ 1.

Sometime in or before September 1993, plaintiffs undertook to form a new club, a Christian bible club, at Roslyn High School. *Id.* ¶ 24. In September 1993, Emily Hsu met with defendant Mark Weyne ("Weyne"), the principal of Roslyn High School at that time, and requested permission to use the school facilities for the proposed bible club. *Id.* ¶ 25; Affidavit of Emily Hsu in Support of Amended Complaint and Motion for Preliminary Injunction ("Emily Hsu Aff.") ¶ 9. Weyne informed Emily Hsu that he needed to research the question and would contact her with a response. Amended Complaint

¶ 25. By November 1993, Weyne still had not contacted Emily Hsu concerning the proposed bible club. *Id.* ¶¶ 25–26; Emily Hsu Aff. ¶ 10. Sometime in mid-November 1993, Emily Hsu and Jane Shin ("Shin"), another student interested in forming the bible club, met with Weyne and defendant Marilyn Silverman ("Silverman"), Assistant Superintendent of the School District. Amended Complaint ¶ 28; Emily Hsu Aff. ¶ 11. At that meeting, defendants informed Emily Hsu and Shin that they were checking the legality of the proposed student bible club and would contact them with their decision. Amended Complaint ¶ 28; Emily Hsu Aff. ¶ 11. Later in November, Emily Hsu and Shin were informed (although plaintiffs do not indicate by whom) that the School Board would discuss the proposal for a student bible club at a December 2, 1993 meeting. Amended Complaint ¶ 29; Emily Hsu Aff. ¶ 12.

At the December 2, 1993 School Board meeting, Silverman stated that the School District was required to grant the bible club access, even though it did not want the club to meet. Emily Hsu Aff. ¶ 15. Silverman also stated that six provisions were required for the club's approval, the first of which was that "membership must be open to all Roslyn students." *Id.*[2] During the meeting, one of the female board members suggested that the School District "merely refuse federal financial assistance" to avoid the requirements of the EAA. *Id.* ¶ 16. After a public discussion was held, the bible club's proposal was tabled. Amended Complaint ¶¶ 31–33; Emily Hsu Aff. ¶¶ 14–18.

On or about December 15, 1993, plaintiffs' counsel sent a letter to the School District, claiming that defendants had violated Emily Hsu's rights under the United States Constitution and the EAA. Amended Complaint ¶ 35; Emily Hsu Aff. ¶ 20. On January 6,

---

1. Assuming that is the case, this action is rendered moot only to the extent it seeks injunctive relief on her behalf. *See, e.g., Clark v. Dallas Indep. Sch. Dist.,* 806 F.Supp. 116, 119 (N.D.Tex. 1992) (graduated high school students did not lack standing to raise constitutional challenges seeking declaratory and monetary relief).

2. The other five provisions were as follows: ▪ faculty members may only be provided to supervise the meetings in a non-participatory manner; [2] no non-Roslyn High School student may conduct or attend the meetings on a regular basis; [3] meetings may occur only during non-instructional school hours; [4] no public funds will be expended on the club except those funds which are incidental to the operation of the room used by the club; and [5] it must be clear that Roslyn does not endorse the message of the club. Emily Hsu Aff. ¶ 15.

1994, Emily Hsu and Shin met with Silverman and defendant Dr. Howard Rubin ("Rubin"), who replaced Weyne as principal of Roslyn High School. Amended Complaint ¶ 36; Emily Hsu Aff. ¶ 21. During that meeting, Silverman and Rubin informed Emily Hsu that the School Board had taken no action on permitting the bible club to meet, and that the School Board required a constitution for the proposed bible club before it could decide whether to permit the club to meet. Amended Complaint ¶ 36; Emily Hsu Aff. ¶ 21.

On January 12, 1994, Emily Hsu submitted the bible club's constitution to Silverman. Amended Complaint ¶ 40 & Ex. C; Emily Hsu Aff. ¶ 22.[3] On January 21, 1994, Silverman informed Emily Hsu that the School Board "had a problem with the Christian Bible club's constitution." Amended Complaint ¶ 40 & Ex. C; Emily Hsu Aff. ¶ 23. Specifically, Silverman indicated that "there were two sections of the constitution which the [School Board] wanted changed": Article I, Section I and Article V, Section II. Amended Complaint ¶ 40; Emily Hsu Aff. ¶ 23. In this respect, Silverman stated that the School Board wanted the word "Christian" changed to "people" in the constitution's definition of "Christian fellowship," Article I, Section I; this definition provided that "Christian fellowship is when Christians gather to praise God...." Amended Complaint ¶ 42; Emily Hsu Aff. ¶ 24. Silverman explained that the School Board "felt that the word 'Christian' was too exclusive." Amended Complaint ¶ 42; Emily Hsu Aff. ¶ 24. Emily Hsu eventually made this change to the club's constitution. However, plaintiffs claim that "Emily Hsu, under coercion, yielded to the requirement and made this change as a good faith effort to resolve the conflict with the [School Board] and end the chilling of her civil rights." Amended Complaint ¶ 42; Emily Hsu Aff. ¶ 24. The second section the School Board wanted changed was Article V, Section II, which provided that "[o]fficers must be professed Christians either through baptism or confirmation." Silverman explained that the School Board

wanted this section changed so that "officers merely were required to be members of the Christian Bible club with the right to vote." Amended Complaint ¶ 44; Emily Hsu Aff. ¶ 25. Plaintiffs claim that in response to this request, "again, pressured by government coercion," Emily Hsu and Shin changed the club's constitution to read: "All members eligible to vote will also be eligible to run for offices. Accepting Jesus Christ as savior is a requirement for all officers." Amended Complaint ¶ 46; Emily Hsu Aff. ¶ 26.

On or about January 26, 1994, Emily Hsu and Shin met with Silverman and defendant Frank Tassone ("Tassone"), Superintendent of the School District. Amended Complaint ¶ 47; Emily Hsu Aff. ¶ 27. Silverman and Tassone again requested that before consideration and approval of the Christian bible club, Emily Hsu and Shin remove the requirement from the club's constitution that officers must be Christians. Amended Complaint ¶ 47; Emily Hsu Aff. ¶ 27. Emily Hsu and Shin refused to comply with this request, "because this act would violate their sincerely-held religious beliefs that all club officers should be Christians." Amended Complaint ¶ 47; Emily Hsu Aff. ¶ 27. Silverman and Tassone stated that the School Board would not approve the constitution with this requirement, and told Emily Hsu and Shin to submit a new constitution for the club. Amended Complaint ¶ 49; Emily Hsu Aff. ¶ 27.

Thereafter, on or about January 31, 1994, Emily Hsu submitted the bible club's constitution, without further revision, to Silverman, who refused to submit the constitution to the School Board for its approval. Amended Complaint ¶ 50; Emily Hsu Aff. ¶ 28. On February 14, 1994, after Emily Hsu "determined that the Christian Bible club would not be permitted to meet," Amended Complaint ¶ 51; Emily Hsu Aff. ¶ 30, plaintiffs commenced this action and requested a preliminary injunction enjoining defendants from denying the bible club access to the school's facilities. Subsequently, on or about March 10, 1994, before any hearing on the

---

3. *See* Constitution of the Roslyn High School Walking On Water Club (Christian Fellowship), in Appendix A hereto.

preliminary injunction motion, the School Board passed a resolution recognizing the formation of, and granting access to, the bible club (the "March 10 Resolution"). Amended Complaint ¶ 52; Emily Hsu Aff. ¶ 31.[4]

On the date scheduled for argument of the preliminary injunction motion, plaintiffs' counsel indicated at a conference before the hearing that plaintiffs intended to file an amended complaint challenging the condition in the first enumerated paragraph of the March 10 Resolution, which provides:

> Membership in the Club shall be limited to Roslyn High School students, and no student shall be discriminated against or excluded from participating in or having access to the Club, *including without limitation entitlement to be an officer of the Club, on the basis of creed or religion.*

*See* Appendix B (emphasis added). Plaintiffs also indicated their intent to renew their motion for a preliminary injunction upon filing their amended complaint. The parties thereupon agreed to a filing date for the amended complaint and a briefing schedule for plaintiffs' preliminary injunction motion.

Defendants maintain that the above paragraph of the March 10 Resolution and the earlier changes to the bible club's constitution requested by school officials were required by the School District's nondiscrimination policy embodied in two policies previously enacted by the School Board: (1) Policy 0100, entitled "Equal Opportunity"; and (2) Policy 5020, entitled "Equal Educational Opportunity." The Equal Opportunity policy provides:

> The [School] Board, its officers and employees will not discriminate against any student ... on the basis of race, color, national origin, creed or religion, marital status, sex, age or handicapping condition.
>
> This policy of nondiscrimination includes: access by students to ... student activities....

Affidavit of Frank Tassone ("Tassone Aff.") Exh. C. The Equal Educational Opportunities policy provides:

> The [School] [D]istrict shall provide every student with equal educational opportunities regardless of race, color, creed, sex, national origin, religion, age, marital status, or disability.
>
> No student will be excluded on such basis from participating in or having access to any ... extracurricular activities or other school resources.

*Id.* According to defendants, the School District's nondiscrimination policy pre-dated plaintiffs' request for recognition of the bible club and has been imposed on all student clubs. *Id.* ¶¶ 15, 30.

Plaintiffs vigorously object to the School District's refusal to exempt the bible club from the nondiscrimination policy as to eligibility to run for office. Plaintiffs contend that each officer of the club "carries a significant spiritual responsibility and import." Amended Complaint ¶ 53; Emily Hsu Aff. ¶ 32; Affidavit of Timothy Hsu in Support of Amended Complaint and Motion for Preliminary Injunction ("Timothy Hsu Aff."), ¶ 10. To this end, plaintiffs detail the activities to be performed by the officers of the club, namely, the President, Vice–President, Secretary, Music Coordinator and Activities Coordinator. Timothy Hsu Aff. ¶¶ 11–15; Amended Complaint ¶¶ 54–58. Among other activities, the President is responsible for the "overall spiritual direction and oversight of the Bible club" and "the spiritual content of the regular weekly meetings." Timothy Hsu Aff. ¶ 11(A), (B); Amended Complaint ¶ 54(A), (B). The Vice–President is required to assist the President in the performance of the President's duties and, in the President's absence, to perform the presidential functions. Timothy Hsu Aff. ¶ 12(A), (B); Amended Complaint ¶ 55(A), (B). Similarly, the Secretary, in the President's and Vice–President's absences, is required to perform the presidential functions. Timothy Hsu Aff. ¶ 13(B); Amended Complaint ¶ 56(B). The Music Coordinator is responsible for "the selection of appropriate praise and worship songs to be used at the weekly meeting" and for "lead[ing] the singing and worship of the Lord by 'exhalt[ing] the Lord Jesus Christ and creat[ing] a sense and spirit of unity

---

**4.** The March 10 Resolution is set out in relevant part in Appendix B hereto.

among those singing.'" Timothy Hsu Aff. ¶ 14(A), (B); Amended Complaint ¶ 57(A), (B). Lastly, the Activities Coordinator is responsible for planning and oversight of activities and "determining which activities would be appropriate in which to participate, *e.g.*, a canned food drive, and those activities in which participation would offend Christian sensibilities, *e.g.*, condom distribution." Timothy Hsu Aff. ¶ 15(A), (B); Amended Complaint ¶ 58(A), (B). In addition to their other activities, each officer is required to (1) "[b]e prepared ... to be called upon at any time to open or close a meeting with prayer ... or to lead a Bible study"; (2) "[b]e prepared ... to serve as a spokesperson for the Bible club in relating the Christian perspective on any particular issue"; and (3) "be able to give testimony to the life-changing presence of Jesus Christ in his/her life and relate that experience in terms of on-going application to the lives of others." Timothy Hsu Aff. ¶¶ 11(C), (D) and (E); 12(C), (D) and (E); 13(C), (D) and (E); 14(C), (D) and (E); and 15(C), (D) and (E); Amended Complaint ¶¶ 54(C), (D) and (E); 55(C), (D) and (E); 56(C), (D) and (E); 57(C), (D) and (E); and 58(C), (D) and (E). In short, the roles of these officers, according to plaintiffs, are "to not only participate *but lead* the club in [its] activities." Plaintiffs' Memorandum in Support of Amended Complaint and Motion for Preliminary Injunction ("Pls.Mem."), at 2–3 (emphasis in original).

Based on the roles of the bible club's officers, plaintiffs argue that the condition prohibiting the club from requiring that officers be "professed Christians" "would influence the form and content of both the club itself, the day to day activities of its members and result in a violation of Plaintiffs' sincerely-held religious beliefs that all club officers should be Christians." Amended Complaint ¶ 53. As a result, plaintiffs claim the School District's "permission for the formation of the Christian Bible Club, contingent upon non-Christians being allowed as officers in the Club," Pls.Mem. at 4, violates the EAA, the First and Fourteenth Amendments, and the RFRA.

Following oral argument on the preliminary injunction motion, the Court reserved decision. This opinion follows.

## II. *DISCUSSION*

### A. *Preliminary Injunction*

In the Second Circuit, to obtain a preliminary injunction the moving party must show: "'(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly toward the party requesting the preliminary relief.'" *Deeper Life Christian Fellowship, Inc. v. Board of Educ.*, 852 F.2d 676, 679 (2d Cir.1988) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

### B. *Irreparable Harm*

■ Defendants contend that plaintiffs will not suffer irreparable harm because the club has been granted access and is not being deprived of their First Amendment rights, and because the club has refused to comply with the condition as to officership and has held no meeting. Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendants' Cross–Motion for Judgment on the Pleadings ("Defs.Mem."), at 8. Defendants misconstrue plaintiffs' contention as to irreparable harm. Essentially, plaintiffs claim that defendants have impermissibly conditioned their access to the school forum in violation of, *inter alia*, their First Amendment rights. If, as plaintiffs contend, they are being deprived of their First Amendment rights by defendants' nondiscrimination policy, they have and will continue to sustain irreparable harm. As the Supreme Court has stated: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *see Deeper Life*, 852 F.2d at 679. Accordingly, this Court finds that plaintiffs have demonstrated that they will suffer irreparable harm.

## C. *Plaintiffs' Claims*

Plaintiffs claim that they are entitled to preliminary injunctive relief because the School District, by imposing its nondiscrimination policy on the bible club,[5] has violated the EAA, the First and Fourteenth Amendments, and the RFRA.[6] The Court must analyze each of these claims to determine whether plaintiffs have satisfied the second prong of the preliminary injunction standard. Neither party cites any case on point, and the Court has found none.

### 1. *Equal Access Act Claim*

■ The EAA requires public secondary schools receiving federal financial assistance to grant equal access to student groups if the school maintains a "limited open forum," *i.e.*, if it permits "one or more noncurriculum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(a) and (b).[7] In *Board of Education of Westside Community Schools v. Mergens*, 496 U.S. 226, 236, 110 S.Ct. 2356, 2364, 110 L.Ed.2d 191 (1990), the Supreme Court held that where the Act's obligations are triggered, the "school may not deny other clubs, on the basis of the content of their speech, equal access to meet on school premises during noninstructional time." The Court further held that the Act, on its face

and as applied to allow access to a student religious group, does not violate the Establishment Clause. *Id.* at 253, 110 S.Ct. at 2373.[8] The Act, the Court noted, was "intended to address perceived widespread discrimination against religious speech in public schools." *Id.* at 239, 110 S.Ct. at 2366. To this end, the "Act's central command [is] that schools not discriminate against religious speech." *See Garnett v. Renton Sch. Dist. No. 403*, 987 F.2d 641, 645 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 72, 126 L.Ed.2d 41 (1993).

The issue is not whether the EAA requires the School District to open its forum to the bible club, for the School District has already agreed to permit the bible club to meet. Nor is the issue, contrary to plaintiffs' arguments, whether the EAA prohibits the School District from determining the leaders, *i.e.*, the "officers," of the student-initiated and student-led bible club, for the School District does not seek to do that. Rather, the issue is whether the EAA requires the School District to exempt a student-initiated and student-led religious club from its nondiscrimination policy, purportedly applied to all student clubs, and permit the club to exclude students from running for office upon the basis of religious beliefs, although the club is open to all students on a voluntary basis.[9]

---

5. Plaintiffs pose their claims as a challenge to the School District's attempt to condition "permission for the formation of the Christian Bible Club ... upon non-Christians being allowed as officers in the Club." Pls.Mem. at 1–2. The amended complaint indicates that plaintiffs believe the School District cannot impose a nondiscrimination policy upon the bible club as to either membership or leadership, *i.e.*, officership, in the club, but plaintiffs have argued only that the policy is impermissible as applied to officership.

6. Plaintiffs do not address the merits of their state constitutional claim on this motion, apparently choosing to raise only their federal constitutional and statutory claims. Accordingly, this Court does not address the state law claim at this time.

7. Section 4071(a) provides:
    It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political,

philosophical, or other content of the speech at such meetings.
20 U.S.C. § 4071(a). Section 4071(b) provides:
    A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurriculum related student groups to meet on school premises during noninstructional time.
20 U.S.C. § 4071(b).

8. Although not important for the present purposes, the Court set forth the definition of a "noncurriculum related student group" that would trigger the Act's requirement of equal access.

9. Whether an "open membership" or "open officership" requirement, *see* Pls.Mem. at 11–12, violates the Act was not at issue in *Mergens;* notably, however, membership in the student bible club there "would have been voluntary and open to all students regardless of religious affiliation." *Mergens*, 496 U.S. at 232, 110 S.Ct. at 2362. Similarly, in *Garnett*, the "[p]laintiffs' group was student initiated, and would have been student led and open to any student on a

The crux of plaintiffs' EAA claim is that the March 10 Resolution's "open officership" requirement, *see* Pls.Mem. at 11–12, violates § 4071(d)(1) of the EAA, which provides: "Nothing in this subchapter shall be construed to authorize the United States or any State or political subdivision thereof—(1) to influence the form or content of any prayer or other religious activity." 20 U.S.C. § 4071(d)(1). Plaintiffs argue that the "plain language of this statute prohibits the School District from attempting to influence the Bible Club's *structure*." Pls.Mem. at 8 (emphasis added). In this respect, plaintiffs argue that the "manifest meaning of the word 'form' is: 'the shape and structure of something....'" *Id.* at 8 (quoting *Webster's Third New Int'l Dictionary* 892 (1993)). Thus, plaintiffs reason, the School District's policy requiring "open officership without reference to religion and creed" is an attempt to influence the "structure" of the club, which translates into an attempt to influence the "form" of the club's activity. *Id.* Based on the same reasoning, plaintiffs argue that the School District's policy also violates § 4071(c)(1) of the Act. This subsection provides that a school offers a "fair opportunity" to students who wish to conduct a meeting within its limited open forum if the school provides that the "meeting is voluntary and student initiated." 20 U.S.C. § 4071(c)(1). Plaintiffs argue that the School District cannot comply with this "fair opportunity" criterion because the "Bible Club structural requirements are neither 'voluntary,' nor 'student initiated.' Once the Roslyn School District became intimately involved in structuring the workings of the Club, it crossed the impassable boundaries of the [Act]." Pls.Mem. at 9. According to plaintiffs, the School District, by its actions, became impermissibly involved in the "administration of religious activities" in violation of the Act. *Id.* at 9–10 (citing *Mergens,* 496 U.S. at 253, 110 S.Ct. at 2373). In addition, plaintiffs argue that the School District's "requirement was created by the

School Board just to impede the formation of the Bible Club." *Id.* at 11. For these reasons, plaintiffs argue, the School District may not impose an "open officership" policy upon the bible club or condition access thereon.

Defendants maintain that application of the School District's nondiscrimination policy to the bible club does not contravene the Act, and that the School District has satisfied its obligations under the Act by affording the bible club access to its facilities on the same basis and subject to the same terms and conditions as all other noncurriculum-related student clubs.[10] Defendants assert that the School District's nondiscrimination policy pre-dated plaintiffs' request for recognition of the bible club, and that the policy has been imposed on all student clubs. Tassone Aff. ¶¶ 15, 30. Defendants argue that the Act "does not require that the [School] District afford a religion club 'privileges' which are not available to other non-curriculum clubs." Defs.Mem. at 14–15. Rather, according to defendants, the club must

> be open, in all respects, to all members of the student body without regard to their religious beliefs. Students may openly express their religious beliefs at club meetings—even as part of an election campaign. Requiring a student, however, to subscribe to a particular religious belief as a *condition of eligibility* to hold office is not permitted.

Tassone Aff. ¶ 23 (emphasis in original). Defendants rely principally on § 4071(d)(5) and (7), which provide that the Act shall not be construed to authorize a school district "to sanction meetings that are otherwise unlawful," 20 U.S.C. § 4071(d)(5), or "to abridge the constitutional rights of any person," *id.* § 4071(d)(7). By allowing the bible club and its members to discriminate against other students on the basis of religion, defendants maintain that the School District would be sanctioning abridgement of excluded students' constitutional rights (*i.e.,* denial of free

---

voluntary basis." *Garnett v. Renton Sch. Dist. No. 403,* No. CV–87–1294, 1994 WL 555397, slip op. at 3 (W.D.Wash. Sep't 15, 1994).

**10.** The benefits afforded a student group upon school recognition include, *inter alia,* use of a

school room, the school's public address system and bulletin boards, and use of the school's hallways to hand out fliers and solicit other students to become members of the club. Tr. 16.

exercise of religion, association and speech rights of those students excluded from officership on the basis of religious speech and beliefs), and sanctioning meetings unlawful under the Fourteenth Amendment of the United States Constitution, Article 1, § 11 of the New York State Constitution,[11] and § 44–a of the New York Civil Rights Law.[12] *See* Defs.Mem. at 15, 17–19.[13] According to defendants, the School District, by requiring the bible club to abide by the nondiscrimination policy, was simply exercising authority to "protect the well-being of the student body and to advance the educational activities and mission of the District," authority expressly recognized by § 4071(f) of the Act. *Id.* at 15–16. Section 4071(f) provides: "Nothing in [the Act] shall be construed to limit the authority of the school . . . to maintain order and discipline on school premises [and] to protect the well-being of students. . . ." 20 U.S.C. § 4071(f).

The Court begins with the plain language of the statute. *See Mergens,* 496 U.S. at 237, 110 S.Ct. at 2365. Section 4071(a) prohibits the School District from denying the bible club "equal access." Equal access provides a student bible club the right "to meet on school property on the *same basis* as other non-curriculum related clubs." *Garnett,* 987 F.2d at 646 (emphasis added). The provisions of subsection (d) designate rules of construction applicable to the Act, not exceptions to it. *See id.* at 644–45. "As such,

[subsection (d) ] instruct[s] the court how to interpret the Act's central command that schools not discriminate against religious speech." *Id.* at 645. Essentially, subsection (d) instructs that school officials not unconstitutionally apply the Act. *Id.*

In *Mergens,* the Supreme Court found that the EAA "reflected at least some consensus of a broad legislative purpose." 496 U.S. at 239, 110 S.Ct. at 2366. A broad reading, the Court determined, "would be consistent with the views of those who sought to end discrimination by allowing students to meet and discuss religion before and after classes." *Id.* Thus, the Supreme Court determined that the entire Act "must be read to effectuate a broad Congressional purpose." *Garnett,* 987 F.2d at 645. The Act's legislative history, however, provides no specific guidance as to whether the School District's nondiscrimination policy as applied to plaintiffs' bible club violates the Act.

Assuming, as the School District maintains, that it subjects all noncurriculum-related student clubs to its nondiscrimination policy, the School District complies with the Act by granting the bible club access subject to the same terms and conditions as all other noncurriculum-related student clubs. Providing access to the bible club on the same basis as all other noncurriculum-related student clubs amounts to "equal access." *See Garnett,* 987 F.2d at 646; *cf. Lloyd v. Grella,*

---

**11.** Article 1, § 11 provides in part: "No person shall, because of race, color, creed or religion, be subjected to any discrimination in civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state." N.Y. Const. art. 1, § 11.

**12.** Defendants refer to section 44–a to the extent it provides: "A person who . . . [e]xcludes a citizen of this state, by reason of race, color [or] creed . . . from the equal enjoyment of any accommodation, facility or privilege furnished by . . . public institutions of learning . . . is guilty of a misdemeanor. . . ." N.Y.Civ.Rights Law § 44–a(1) (McKinney 1992).

**13.** Defendants reason as follows:

The provision in plaintiffs' proposed constitution clearly discriminates against those non-Christian students who choose to be members of the club, but, who, based on their religious

beliefs, are unable to declare their acceptance of Jesus Christ as their Savior. Students frequently join a number of student clubs, including those clubs which present cultures and offer experiences other than those they are already familiar with. Students of Hispanic descent may, for example, join the French Club. It is foreseeable that non-Christians may wish to join the [bible] club in an effort to expand their knowledge of different religions and to meet people with different backgrounds. Indeed, they may take their membership very seriously and wish to hold office not because they intend to be subversive, but because they truly want to promote the club's activities. To deprive these students of meaningful membership by denying them an equal opportunity to participate in all club activities, simply because they hold different religious beliefs, would violate federal and New York State law. Access for such a club is not mandated by the Equal Access Act.

Defs.Mem. at 18–19.

83 N.Y.2d 537, 611 N.Y.S.2d 799, 801, 634 N.E.2d 171, 173 (1994) (holding statute granting military recruiters access to educational venues "on the same basis" as all other employment recruiters grants "equal access" not "unqualified access"; and upholding school board resolution barring employers, including military, who discriminated on the basis of sexual orientation from school site student recruitment). Thus, it is not a denial of "equal access," as commanded by the Act, for the School District to require that all student-initiated and student-led clubs, including a religious club, have membership and officership open, in all respects, to all Roslyn students pursuant to a nondiscrimination policy.

In this Court's view, the School District's nondiscrimination policy cannot be said to influence the form or content of the bible club's proposed religious speech and religious activities in that, as discussed herein, the School District's policy does not unconstitutionally interfere in the club's members' and officers' determination of appropriate prayer and other religious activity, for example, "Christian fellowship," "singspiration," and "testimonies of their belief, faith, walk, experiences in or with Christ Jesus," *see* Constitution of the Roslyn High School Walking On Water Club (Christian Fellowship), Appendix A. The nondiscrimination policy does not impermissibly inhibit or prevent the bible club's members from selecting those students they desire to lead the club in prayer or other religious activity, contrary to plaintiffs' contentions.[14] Moreover, any claim that the policy jeopardizes the bible club's ability to be led by students freely chosen by its members arguably is counteracted by the School District's obligation to permit students to initiate and organize additional religious clubs if requested. *See Mergens,* 496 U.S. at 252, 110 S.Ct. at 2373. Should students holding religious beliefs differing from those of the bible club's members desire to conduct meetings to engage in prayer or other reli-

gious activity, they would be entitled to equal access as well, subject of course to the School District's nondiscrimination policy. Elective forces would also necessarily govern the leadership of any other religious club.

If the bible club were a distinctly private club then there would be force to plaintiffs' contention, *see, e.g.* Tr. 25–26, 37, that the club and its members may discriminate on the basis of religion, race, sex, *etc.,* in their private affairs as against others. However, they are not a distinctly private group—they are a student group, which sought and was granted school-recognized access to public school facilities. Presumably, the bible club and its members intend to take advantage of the benefits attendant to equal access. It is not unreasonable to require that they also accept the conditions thereto, including the prohibition on discrimination against any Roslyn student. To allow an exemption from the nondiscrimination policy, the School District would be tolerating, if not expressly sanctioning, conduct that would be unconstitutional for it to engage in directly. *See* 20 U.S.C. § 4071(d)(7); *see also Garnett,* 987 F.2d at 645 (§ 4071(d)(7) is a " 'savings' clause that protects against reading implications into the EAA which might abridge federal constitutional rights ... for persons ... within its scope"). Although the parties vigorously dispute whether the student bible club and its members are state actors or a place of public accommodation if they engage in discriminatory practices through the use of public school facilities, this Court does not find those issues determinative of plaintiffs' claim. Rather, what is determinative is that it appears that the School District has provided the bible club "equal access" as the nondiscrimination policy is not aimed at suppression of religious speech or beliefs, but at furthering the School's interest in protecting the well-being of all students by ensuring equal and nondiscriminatory access of all students to student clubs.

14. For example, plaintiffs argue that, under the EAA, "if they wanted to have an Islam club and they want only the followers of Islam to be in the officership[,] they have a right to do that and the school can't tell them they have to have Jewish students or Emily Hsu to be in that club or put in

that position." Tr. 40–41. Contrary to plaintiffs' assertions, the School District, by imposing its nondiscrimination policy on the bible club, does not require that non-Christians "be an integral part of the Christian Bible Club's hierarchical structure," Pls.Mem. at 3.

Although plaintiffs suggest that by allowing the School District's policy to stand the bible club risks facing "non-Christian leadership,"[15] there is no evidence in the record whatsoever that such an event is threatened or likely. Indeed, Emily Hsu and Timothy Hsu both assert that they have "not had any conversation or received any other information from any student at Roslyn High School who is not a Christian, indicating their desire to become an officer in our Christian Bible club." Emily Hsu Aff. ¶ 43; Timothy Hsu Aff. ¶ 21. Plaintiffs' speculation that the bible club may be "taken over" by "atheists" or any other students or group does not warrant the relief they seek.

As there is no basis in the record for plaintiffs' suggestion that the School District will not afford the bible club the *same* privileges afforded other noncurriculum-related student clubs and allow it to meet on the *same* terms and conditions as those other clubs, the School District appears to have satisfied its obligation under the Act of permitting religious speech and religious activities on a nondiscriminatory basis.

Accordingly, plaintiffs have failed to demonstrate a likelihood of success or sufficiently serious questions as to whether the nondis-

crimination policy, as applied to the bible club, violates the EAA.[16]

2. *First and Fourteenth Amendment and RFRA Claims*

It is well recognized that "students [do not] shed their constitutional rights ... at the schoolhouse gate." *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969) (upholding rights of secondary school students to wear armbands protesting Vietnam War); *see also Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S.Ct. 562, 567, 98 L.Ed.2d 592 (1988). Whether in school or out of school, students are "persons" under the Constitution. *Tinker*, 393 U.S. at 511, 89 S.Ct. at 739. As such, [t]hey are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State.... The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational

---

**15.** Plaintiffs suggest that the School District is "forcing the plaintiffs to face the *very real eventuality* that the Club will be run by students who are hostile to the plaintiffs' religious beliefs." Pls.Mem. at 17 (emphasis added). At oral argument, plaintiffs' counsel hypothesized that "if 50 students that were in this case either Christians or whatever they might be join the Christian club they could vote their candidates in to officership and vote to disband the club. We don't have to wait for that harm to happen since they are requiring for the club to be recognized that we submit a constitution that meets that provision." Tr. 25. Similarly, plaintiffs assert: "For example, if the Bible Club has ten religious members and twenty atheists then join, under the Roslyn School Board policy, the atheists would be entitled to take over the club and (and presumably, subdue) its religious functions. Because Evangelical Christian students are a minority at Roslyn High School, this scenario is a *distinct possibility*." Pls.Mem. at 9 (emphasis added).

**16.** Plaintiffs also claim that the School District's requirement that the bible club submit a constitution "was created by the School Board just to impede the formation of the Bible Club," as

evidenced by a February 10, 1994 memorandum from Principal Rubin to Roslyn High School Clubs, which plaintiffs maintain shows that up until that date, no club was required to submit a constitution. Pls.Mem. at 10. Plaintiffs urge that the School District may not impose the nondiscrimination policy on the bible club because of defendants' "past discrimination" against the club. *Id.* at 11. Defendants maintain that the School District gave plaintiffs' request to form the club proper attention, as they needed adequate time and information to determine the School District's obligations regarding the request. Tassone Aff. ¶¶ 4–24. In addition, defendants assert that "student clubs typically have written constitutions," consistent with a recommendation by the Commission on Secondary Schools of the Middle States Association of Colleges and Schools—of which the School District is a member—that all student clubs have a constitution. *Id.* ¶ 11. When the School District became aware that "a few established clubs do not have or could not locate constitutions," those clubs were requested to submit constitutions. *Id.* Based on the present record, plaintiffs' conclusory allegation of "past discrimination" by the School District appears to be of little merit.

process. A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects ..., if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others.

*Id.* at 511–13, 89 S.Ct. at 739–40. It is indisputable that the "Fourteenth Amendment protects the rights of students against encroachment by public school officials." *New Jersey v. T.L.O.*, 469 U.S. 325, 334, 105 S.Ct. 733, 738, 83 L.Ed.2d 720 (1985). Thus, the Supreme Court reiterated in *T.L.O.*:

The Fourteenth Amendment ... protects the citizen against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes.

*Id.* at 334, 105 S.Ct. at 738–39 (quoting *West Virginia State Board of Educ. v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943)).

Nevertheless, students' constitutional rights are "not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986). Thus, the Court has recognized the propriety of restrictions on a student's First Amendment rights in the school setting, particularly where the student's "speech or action ... intrudes upon the work of the schools or the rights of other students." *Tinker*, 393 U.S. at 508, 89 S.Ct. at 737; *see, e.g., Kuhlmeier*, 484 U.S. at 266, 108 S.Ct. at 567 (holding school need not tolerate student speech inconsistent with educational mission of school, even though government could not censor similar speech outside school context); *Fraser*, 478 U.S. at 685–86, 106 S.Ct. at 3165–66 (holding secondary school student could be disciplined for delivering sexually explicit, but not legally obscene, speech at school assembly); *T.L.O.*, 469 U.S. at 340–42, 105 S.Ct. at 742–43 (holding "school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject").

The religion clauses of the First Amendment, as applied to the states—here, the School District—through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), provide that a state "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. These clauses mean that "religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State." *Lee v. Weisman*, —— U.S. ——, ——, 112 S.Ct. 2649, 2654, 120 L.Ed.2d 467 (1992). The First Amendment "requires the state to be neutral in its relations with groups of believers and non-believers; it does not require the state to be their adversary. State power is no more to be used to handicap religions than it is to favor them." *See Everson v. Board of Educ.*, 330 U.S. 1, 18, 67 S.Ct. 504, 513, 91 L.Ed. 711 (1947).

Under the Establishment Clause "total separation is not possible in an absolute sense, [for] [s]ome relationship between government and religious organizations is inevitable." *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971); *Catholic High Sch. Ass'n of Archdiocese of New York v. Culvert*, 753 F.2d 1161, 1166 (2d Cir.1985). Rather, "the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending upon all the circumstances of a particular relationship." *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112; *Culvert*, 753 F.2d at 1166. In other words, the Constitution does not require "complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673, 104 S.Ct. 1355,

1359, 79 L.Ed.2d 604 (1984). Indeed, through accommodation "of all faiths and all forms of religious expression" our government has " 'respect[ed] the religious nature of our people.' " *Id.* at 677–78, 104 S.Ct. at 1361 (quoting *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 684, 96 L.Ed. 954 (1952)).

■ To facilitate analysis of an Establishment Clause claim, the Supreme Court has applied a now-familiar three-pronged test. To satisfy the Establishment Clause, a governmental policy—here, the School District's nondiscrimination policy—must (1) have a secular purpose; (2) have a principal or primary effect that neither advances nor inhibits religion; and (3) not foster an excessive government entanglement with religion. *Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111; *see also Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981); *Committee for Pub. Educ. & Religious Liberty v. Nyquist,* 413 U.S. 756, 772–73, 93 S.Ct. 2955, 2965–66, 37 L.Ed.2d 948 (1973); *see, e.g., Rosenberger v. Rector & Visitors of Univ. of Va.,* 18 F.3d 269, 282 (4th Cir.) (applying *Lemon* test to university policy excluding religious activities from eligibility for student activities funds), *cert. granted,* — U.S. —, 115 S.Ct. 417, 130 L.Ed.2d 333 (1994); *DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 168 (2d Cir.1993) (applying *Lemon* test to determine whether Age Discrimination in Employment Act applies to action brought by lay teacher against his parochial school employer).

Plaintiffs do not dispute that the nondiscrimination policy satisfies the first prong of the *Lemon* test. A nondiscrimination policy undeniably has a secular purpose of advancing the school educational mission free of discriminatory influence. *Cf. Mergens,* 496 U.S. at 248, 110 S.Ct. at 2371 ("Congress' avowed purpose—to prevent discrimination against religious and other types of speech—is undeniably secular."); *Rosenberger,* 18 F.3d at 284 (enforcement of nondiscrimination policy advances the "secular purpose" of avoiding an establishment of religion at school). It seems clear the School District's policy was not motivated wholly by religious considerations, *Wallace v. Jaffree,* 472 U.S. 38, 56,

105 S.Ct. 2479, 2489–90, 86 L.Ed.2d 29 (1985); *Lynch,* 465 U.S. at 680, 104 S.Ct. at 1362–63; nor does the policy evince an intent to promote or inhibit a particular point of view in religious matters, *see Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 335, 107 S.Ct. 2862, 2868, 97 L.Ed.2d 273 (1987).

Rather, plaintiffs argue that the School District's nondiscrimination policy requiring "open officership without reference to religion and creed," Pls.Mem. 11–12, violates the second and third prongs of the *Lemon* test. Plaintiffs argue that the effect of the nondiscrimination policy on the bible club is to inhibit plaintiffs' exercise of their religious beliefs, particularly in their choice of the club's leaders, and that the School District will inevitably "invasively monitor the religious activities" of the club to ensure enforcement of the policy. *Id.* at 3, 11–16.

■ School-time religious activities at public school facilities are offensive to the Establishment Clause, particularly because of the public school's unique place in American life. *See School Dist. of Abington Township v. Schempp,* 374 U.S. 203, 230, 83 S.Ct. 1560, 1575–76, 10 L.Ed.2d 844 (1963) (Brennan, J., concurring); *Illinois ex rel. McCollum v. Board of Educ.,* 333 U.S. 203, 216–17, 68 S.Ct. 461, 467–68, 92 L.Ed. 649 (1948) (Frankfurter, J., concurring); *see also Lee v. Weisman,* — U.S. —, — – —, 112 S.Ct. 2649, 2655–59, 120 L.Ed.2d 467 (1992); *see generally* Laurence H. Tribe, *American Constitutional Law* § 14–5, at 1174–75 (2d ed. 1988) (hereinafter "Tribe") ("School is the forum through which basic norms are transmitted to our young, as well as a 'most vital civic institution for the preservation of a democratic system of government.' When government permits a religion to take over part of a public school's facilities during the school day, it strongly implies official endorsement of the particular religion." (quoting *Schempp,* 374 U.S. at 230, 83 S.Ct. at 1576 (Brennan, J., concurring))). On the other hand, nonschool-time religious activities at school facilities by student-initiated and student-led groups convey no message of official endorsement, and typically would not offend

the Establishment Clause. *See Mergens*, 496 U.S. at 252, 110 S.Ct. at 2373 ("A school that permits a student-initiated and student-led religious club to meet after school, just as it permits any other student group to do, does not convey a message of state approval or endorsement of the particular religion.") [17]; *see also* Tribe § 14–5, at 1175. During non-school hours students may voluntarily elect not to participate in student-initiated and student-led religious activities, just as they generally may elect not to participate in other available noncurriculum-related student activities. Coercion is not inherent in this context because students who wish not to participate in a student-initiated and student-led religious activity may freely choose not to. *Mergens*, 496 U.S. at 251, 110 S.Ct. at 2372 ("[T]here is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and no school officials actively participate.").

However, this case does not involve endorsement by school authorities of religious activities occurring during the mandated school day or at mandated school events. Nor does it involve coercion of students to participate in a student-initiated and student-led religious activity. Rather, this case raises concerns as to the rights of students not to be excluded from participating, in all respects, in a nonschool-time student-initiated and student-led religious activity based solely upon their religious beliefs. Just as a message of exclusion is conveyed where school officials refuse to let a student religious group use school facilities during nonschool hours, but allow other noncurriculum-related groups to meet during that time, *see Mergens*, 496 U.S. at 248–50, 110 S.Ct. at 2370–71, a message of exclusion is conveyed where school officials permit discrimination against students by allowing—through exemption from a neutral and generally applicable policy—a student religious club to condition eligibility to run for office upon students' religious beliefs. Just as "racial discrimination in education violates a most fundamental national public policy, as well as rights of individuals," *Bob Jones Univ. v. United States*, 461 U.S. 574, 593, 103 S.Ct. 2017, 2029, 76 L.Ed.2d 157 (1983), so too does discrimination based on religion in the school setting. That students' religious beliefs and expressions may exist within a wholly private sphere, *see Lee*, —— U.S. at ——, 112 S.Ct. at 2656, does not prevent the School District from imposing a facially neutral nondiscrimination policy on all student clubs to protect the rights of all students to be free from discrimination.

By enforcing its policy, the School District does not convey or attempt to convey a message that religion or particular religious beliefs are favored or disfavored, something school officials may not do. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, —— U.S. ——, ——, 113 S.Ct. 2217, 2226, 124 L.Ed.2d 472 (1993); *Wallace*, 472 U.S. at 70, 105 S.Ct. at 2497 (O'Connor, J., concurring in the judgment). The application of this nondiscrimination policy to a broad spectrum of student clubs, as well as to a broad spectrum of school life, is an important index of the policy's secular effect—elimination and prevention of invidious discrimination in Roslyn's public schools. Contrary to plaintiffs' contentions, *see* Pls.Mem. at 15, by applying its nondiscrimination policy to all school clubs, the School District does not impermissibly inhibit religion or particular religious beliefs or expression. The policy does not require that students of any particular religious denomination or nondenomination or students holding particular religious beliefs be selected as officers to lead the club, contrary to plaintiffs' contention. Rather, the bible club's members apparently are provided unfettered opportunity to express their religious beliefs and engage in religious activity and may freely choose those students they believe should lead them in prayer and other religious activities. Accordingly, the nondiscrimination policy does not have a principal or primary effect that inhibits religion.

**17.** The *Mergens* Court emphasized the "crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." 496 U.S. at 250, 110 S.Ct. at 2372 (emphasis in original).

As for the third prong of the *Lemon* test, plaintiffs contend that the School District made the "structure" of the bible club a "secular issue" by imposing the nondiscrimination policy on the bible club, resulting in excessive entanglement of the school "with church affairs." Pls.Mem. at 14. To the contrary, the nondiscrimination policy as applied to the bible club does not foster an excessive government entanglement with religion; rather it avoids excessive entanglement between and among the School District and student members of the bible club over religious issues. If all students are entitled to be members and hold office in the bible club regardless of religious beliefs, then there would be no reason for the School District to become involved in the members' determination of their officers. Under these circumstances, if a student claims to have been excluded from seeking office in the bible club on the basis of religious beliefs, the School District may be called upon to determine only the basis for the exclusion, not the genuineness, truthfulness or validity of that particular student's or any other students' religious beliefs. By requiring that all students be entitled to run for office regardless of religious beliefs, a student not selected to office would have no basis to challenge the other students' determination. If the nondiscrimination policy is not imposed, then the School District would conceivably be called upon by excluded students to determine if those students' beliefs are sufficient for them to run for office. These circumstances would pose a greater, and unavoidable, risk of excessive entanglement by the School District with religious issues. Clearly, the School District may not serve as an arbiter of the truthfulness or validity of any student's religious beliefs. *See DeMarco,* 4 F.3d at 170. Accordingly, the Establishment Clause is not violated by the School District imposing the nondiscrimination policy on the bible club.

■ Plaintiffs also claim that the School District infringed their rights under the Free Exercise Clause. In this respect, plaintiffs assert that the School District has restrained them from meeting and engaging in religious activity, by refusing to "accommodate" their sincerely held religious beliefs that "leadership positions should be held only by those whose sincerely-held religious beliefs reflect the values of, and a regard for, the Bible club's stated purpose pursuant to Article II §§ 1–4 of the constitution, *i.e.,* perpetuating and encouraging Christian ideals." Emily Hsu Aff. ¶ 31; Timothy Hsu Aff. ¶ 9. Plaintiffs argue that the School District has impermissibly imposed preconditions on their exercise of religious beliefs, thereby violating plaintiffs' constitutional rights.

The Supreme Court has long held that the Free Exercise Clause is an absolute prohibition against governmental regulation of religious beliefs. *Employment Div., Dep't. of Human Resources v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990); *Bob Jones Univ.,* 461 U.S. at 603, 103 S.Ct. at 2034; *Braunfeld v. Brown,* 366 U.S. 599, 603, 81 S.Ct. 1144, 1146, 6 L.Ed.2d 563 (1961) (citing *Cantwell,* 310 U.S. at 303, 60 S.Ct. at 903). The government may

> not compel affirmation of religious belief, *see Torcaso v. Watkins,* 367 U.S. 488 [81 S.Ct. 1680, 6 L.Ed.2d 982] (1961), punish the expression of religious doctrines it believes to be false, *United States v. Ballard,* 322 U.S. 78, 86–88 [64 S.Ct. 882, 886–87, 88 L.Ed. 1148] (1944), impose special disabilities on the basis of religious views or religious status, *see McDaniel v. Paty,* 435 U.S. 618 [98 S.Ct. 1322, 55 L.Ed.2d 593] (1978); *Fowler v. Rhode Island,* 345 U.S. 67, 69 [73 S.Ct. 526, 527, 97 L.Ed. 828] (1953); *cf. Larson v. Valente,* 456 U.S. 228, 245 [102 S.Ct. 1673, 1683–84, 72 L.Ed.2d 33] (1982), or lend its power to one or the other side in controversies over religious authority or dogma, *see Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 445–52 [89 S.Ct. 601, 604–08, 21 L.Ed.2d 658] (1969); *Kedroff v. St. Nicholas Cathedral,* 344 U.S. 94, 95–119 [73 S.Ct. 143, 143–56, 97 L.Ed. 120] (1952); *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 708–25 [96 S.Ct. 2372, 2380–88, 49 L.Ed.2d 151] (1976).

*Smith,* 494 U.S. at 877, 110 S.Ct. at 1599; *Sherbert v. Verner,* 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963). Moreover, "[i]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing

of conditions upon a benefit or privilege." *Sherbert*, 374 U.S. at 405, 83 S.Ct. at 1794; *see also Rosenberger*, 18 F.3d at 279 ("Unconstitutional conditions, which make enjoyment of a governmental benefit contingent on sacrifice of an independent constitutional right, are *prima facie* invalid.").[18] "Whether a condition is unconstitutional depends on whether the government may properly demand sacrifice of the particular right asserted in the context of its exercise." *Rosenberger*, 18 F.3d at 279.

Plaintiffs assert their free exercise challenge under the recently-enacted RFRA, which provides that all free exercise of religion challenges be guided by the "compelling state interest" test. *See* 42 U.S.C. § 2000bb-1.[19] Under this test, the government may justify a law burdening the free exercise of religion if it employs the least restrictive means of achieving a compelling state interest. *Id.* § 2000bb-1(b); *see, e.g., Thomas v. Review Board of Indiana Employment Security Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981); *Sherbert*, 374 U.S. at 406-07, 83 S.Ct. at 1795-96.[20]

This Court does not agree with plaintiffs that the School District must "accommodate"

18. As the Supreme Court stated in *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972):

[I]f the government could deny a benefit to a person because of his constitutionally protected speech ..., his exercise of th[at] freedom[ ] would in effect be penalized and inhibited. This would allow the government to "produce a result which [it] could not command directly." Such interference with constitutional rights is impermissible.

*Id.* at 597, 92 S.Ct. at 2697.

19. Section 2000bb-1 provides:
(a) In general
   Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.
(b) Exception
   Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
   (1) is in furtherance of a compelling governmental interest; and
   (2) is the least restrictive means of furthering that compelling governmental interest.
(c) Judicial relief
   A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be government by the general rules of standing under article III of the Constitution.
42 U.S.C. § 2000bb-1.

20. This test had been applied to free exercise of religion claims prior to the Supreme Court's decision in *Smith, supra*. In *Smith*, the Supreme Court held that a state could prohibit sacramental peyote use (and deny unemployment benefits to a person discharged for such use), by application of a neutral, generally applicable regulatory law forbidding such activity. *Smith*, 494 U.S. at 876-90, 110 S.Ct. at 1598-1606. The Court in *Smith* determined that a neutral and generally applicable law that has an incidental effect of burdening a person's exercise of religion by requiring (or forbidding) conduct that the person's religious belief forbids (or prescribes) need not be justified by a compelling state interest. *See id.* at 878-89, 110 S.Ct. at 1599-1606; *see also Church of Lukumi Babalu Aye, Inc.*, —— U.S. at ——, 113 S.Ct. at 2226. The Court concluded that "the sounder approach, and the approach in accord with a vast majority of our precedents, is to hold the [compelling interest] test inapplicable to such challenges." *Smith*, 494 U.S. at 885, 110 S.Ct. at 1603. Although *Smith* involved a criminal statute, its holding has been applied to civil statutes as well. *See, e.g., Rector, Wardens, & Members of the Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348, 353-56 (2d Cir.1990), *cert. denied*, 499 U.S. 905, 111 S.Ct. 1103, 113 L.Ed.2d 214 (1991). However, the Court in *Smith* suggested that the compelling state interest test would apply in cases involving the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech or freedom of association, so-called "hybrid situations." 494 U.S. at 881-82, 110 S.Ct. at 1601-02. Nevertheless, the RFRA restored the compelling state interest test in all free exercise of religion challenges, and provided a claim for persons whose free exercise rights are substantially burdened by government. *See* 42 U.S.C. § 2000bb. As Congress explicitly stated: "The purposes of this chapter are—(1) to restore the compelling interest test ... and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government." *Id.* Defendants do not challenge the constitutionality of the RFRA or the applicability of the compelling state interest test. In any event, this Court need not address these issues because, as discussed below, plaintiffs have failed to make the requisite showing for preliminary injunctive relief even under the compelling state interest test.

their sincerely held religious beliefs by exempting the bible club from its facially neutral nondiscrimination policy. Even assuming that application of the nondiscrimination policy actually burdens plaintiffs' freedom to exercise religious beliefs, a very minimum for exemption·from the policy, *see Tony & Susan Alamo Found. v. Secretary of Labor,* 471 U.S. 290, 303, 105 S.Ct. 1953, 1962, 85 L.Ed.2d 278 (1985), by exempting the club from the policy the School District would not be lifting a regulation merely that burdens plaintiffs' exercise of religion, but one that ensures all other students the right to be free from invidious discrimination in school. The School District' interest, whether arising under federal or New York law, in eliminating and preventing religious discrimination in school certainly may be characterized as "compelling." The School District cannot accommodate the bible club without ignoring the collision between plaintiffs' constitutional rights and the rights of other Roslyn students to be free from discrimination in school, whether in a curriculum or noncurriculum-related school-recognized student activity. Where, as here, discrimination by the bible club on the basis of religion would "impinge upon the rights of other students," *Tinker,* 393 U.S. at 509, 89 S.Ct. at 73, the School District should be permitted to enforce its nondiscrimination policy against all clubs to protect the rights and well-being of all students; a school-recognized club that is permitted to discriminate on the basis of religion likely would be disruptive to the educational mission of the school. It is doubtful that this compelling interest can be achieved by any significantly less restrictive means than an outright ban on discrimination, and plaintiffs suggest none. Significantly, the School District's nondiscrimination policy is unrelated to the suppression of religious beliefs and expression, and does not prevent the bible club's student members from selecting those students they desire to lead the club in prayer or other religious

activity. Based on the record presented thus far, it appears that plaintiffs' enjoyment of a governmental benefit (*i.e.,* access to the school's facilities) is not being unconstitutionally conditioned upon plaintiffs' foregoing constitutionally protected religious beliefs or expression. Accordingly, the Free Exercise Clause does not mandate the special treatment to which plaintiffs claim they are entitled.

█ Plaintiffs assert a claim for violation of their free speech rights. *See* Amended Complaint ¶¶ 69–73. To the extent plaintiffs claim that imposition of the nondiscrimination policy to the bible club violates plaintiffs' free speech rights, this claim is of doubtful merit.[21] The policy apparently is not aimed at the suppression of speech and does not distinguish prohibited from permitted activity on the basis of content or viewpoint of speech; moreover, the compelling interest it seeks to further—elimination and prevention of invidious discrimination of Roslyn students—likely cannot be achieved by any significantly less restrictive means.

█ Plaintiffs also claim that the nondiscrimination policy infringes their rights to freedom of association, a separate and distinct right emanating from the First Amendment. *See Roberts v. United States Jaycees,* 468 U.S. 609, 622–23, 104 S.Ct. 3244, 3252, 82 L.Ed.2d 462 (1984); *Healy v. James,* 408 U.S. 169, 181,·92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460–61, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958). The right to associate for expressive purposes, however, is not absolute. *See Roberts,* 468 U.S. at 623, 104 S.Ct. at 3252–53. Rather, as the Supreme Court recognized in *Roberts:*

> Infringements on that right may be justified by regulations adopted to serve compelling state interests unrelated to the suppression of ideas that cannot be achieved

21. This claim appears to be based primarily on plaintiffs' contention that defendants purposefully delayed determining their request for recognition of the bible club, and imposed unlawful obstacles to the formation of the club (presumably referring to the requirement of a written constitution and the imposition of the nondiscri-

mination policy) because of the religious content and viewpoint of plaintiffs' speech. *Id.* ¶ 70. Plaintiffs also assert equal protection and due process claims based on these allegations. *See id.* ¶¶ 95–97 and ¶ 101. To the extent plaintiffs base these claims on allegations of "past discrimination" these claims appear to have little merit.

through means significantly less restrictive of associational freedoms.

*Id.*

Plaintiffs' counsel argues that the bible club is a distinctly "private group." Transcript of Oral Argument ("Tr.") 26. As a "private group," plaintiffs' counsel urges that the club clearly may discriminate based on religion. Plaintiffs' counsel suggests, by example, that "a Jewish students' club could meet and say we don't want Ms. Hsu to be the president of our club or to be a member of our club or to be an officer of the club, certainly they have the right to do that." Tr. 25–26. In response to questioning from the Court, plaintiffs' counsel further argued that the bible club could even discriminate as to membership and officership on bases other than religion. In this respect, plaintiffs' counsel asserted that the bible club could, for instance, exclude black students if it "believes that blacks should not be part of their group." Tr. 37. Defendants, on the other hand, argue that the bible club is not a "distinctly private club, but one open to the general student population and exclusively associated with a public facility. As a result, it must comply with federal and state laws which prohibit discrimination." Defs.Mem. at 32; *see also* Tr. 16–17, 41 ("[T]he Christian religion club at Roslyn High School is not a private church, it's not a private synagogue, which is the analogy the [plaintiffs' counsel] has arrived upon.").

By characterizing their club as a "private group" free to discriminate on any basis it chooses, plaintiffs ignore the obvious—the bible club is a "student club." As such, the School District may subject the bible club and its members to reasonable school regulations aimed at preventing interference with the opportunities and rights of other students. *See Tinker,* 393 U.S. at 506, 89 S.Ct. at 736; *cf. Healy,* 408 U.S. at 188–89 & n. 20, 92 S.Ct. at 2349–50 & n. 20 ("In the context, of the 'special characteristics of the school environment,' the power of the government to prohibit 'lawless action' is not limited to acts of a criminal nature. Also prohibitable are actions which 'materially and substantially disrupt the work and discipline of the school.' Associational activities need not be tolerated where they infringe reasonable campus rules...." (quoting *Tinker,* 393 U.S. at 506, 513, 89 S.Ct. at 736, 740)). To the extent the nondiscrimination policy may burden plaintiffs' and the bible club's members' freedom to select leaders of their own choosing, imposition of the policy appears justified by the School District's compelling interest in eliminating and preventing discrimination against Roslyn students, a goal that, under the circumstances, likely cannot be achieved by any significantly less restrictive means. The policy apparently is not aimed at the suppression of speech, is applied to all student clubs as a condition to access, and does not distinguish prohibited from permitted activity on the basis of content or viewpoint of speech.

Accordingly, plaintiffs have failed to demonstrated a likelihood of success or sufficiently serious questions as to whether the nondiscrimination policy, as applied to the bible club, violates the First and Fourteenth Amendments or the RFRA.

### III. CONCLUSION

For the reasons above, plaintiffs' motion for a preliminary injunction is denied, and defendants' cross-motion for judgment on the pleadings is denied without prejudice to their right to move for summary judgment following discovery.

SO ORDERED.

### APPENDIX A.

**Constitution of the Roslyn High School Walking On Water Club**

**(Christian Fellowship)**

**Article I—Student Organization**

Section I:  This student organization will be known as the *Walking on Water* club of Roslyn High School.

Section II:  Meetings are open to all and limited to only Roslyn High School students regardless of race, color, age, religion, sex, national origin, or physical handicap.

## Article II—Purpose

Section I:    This club will provide a time of praise for students to gather in Christian fellowship.

    a.    Christian fellowship is when Christians gather to praise God, to encourage one another, to strengthen their walk with the Lord in dealing with life's problems, and to enjoy each other's company.

Section II:    This club will provide fellowship in the form of singspiration.

    a.    Singspiration is singing inspirational music which exalts the Lord Jesus Christ and creates a sense and spirit of unity among those singing.

Section III: This club will allow students to share and/or to give testimonies of their belief, faith, walk, experiences in or with Christ Jesus.

Section IV:    This club would like to spread the Good News of God and His word.

    a.    God's word is the Bible which Christians live by.

    b.    The Bible will be used in study in order that people may learn about it.

Section V: This club would like to bring a positive atmosphere to the student body of Roslyn High School in which students may learn and see the aspects and beliefs of Christianity.

## Article III—Meetings

Section I:    Meetings will be held once a week after school.  A typical meeting would be as follows:

    a.    Meetings would be opened with a prayer.

    b.    Singspiration would be led by a student for approximately half an hour.

    c.    The next 25 minutes would be designated to a specific activity for that meeting.  These activities can include guest speakers, more singspiration, dramas/skits, videos/audio, sharing, games, prayer discussions, and Bible studies.

    —non-school persons, including guest speakers, may not direct, conduct, control or regularly attend meetings.

    d.    Meetings would be closed with a prayer.

## Article IV—Potential Projects

Section I:    Potential projects of the club can include outings, picnics, community service/volunteer work, and fund raising for charity.

## Article V—Elections and Officers

Section I:    Elections will take place in the May of the preceding year.  Officers shall assume their designated responsibilities on a full-time basis in the September of the following school year.

    a.    Voter for the officers will be those who have attended at least ⅔ of the meetings for that school year.

Section II:    Officers must be professed Christians either through baptism or confirmation.

Section III: The positions to be filled will be President, Vice President, Secretary, Music Coordinator, and Activities Coordinator.

Section IV:    Any officer who is remiss in his/her duties may be *impeached.*  When impeachment of an officer is brought to attention, the remaining four officers will review the situation and vote for or against impeachment.

## Article VI—Miscellaneous

Section I:    The official verse of *Walking On Water* will be Hebrew 10:25, "Let us not give up meeting together, as some are in the habit of doing, but let us encourage one another—and all the more as you see the Day approaching."

## Article VII—Amendments

Section I:    Amendments will be made to this constitution whenever deemed necessary.

      ❖     *     ❖

APPENDIX B.

## MARCH 10, 1994 RESOLUTION

.    .    .    .    .

WHEREAS, the Roslyn Union Free School District has always supported the principle of a free public education, as well as the separation of Church and State, constitutionally guaranteed to all; and

WHEREAS, the Roslyn Union Free School District has opposed organized prayer in the public schools; and

WHEREAS, we are concerned that the formation of a religious club could lead to the feeling on the part of some students that they would be excluded or ostracized if they failed to participate in any organized prayers at such a religious club; and

WHEREAS, the Federal Equal Access Act of 1984, as upheld and interpreted by the United States Supreme Court in 1990, requires public secondary schools that receive Federal financial assistance to allow student religious clubs to meet on school premises during non-school hours on the same voluntary basis as other non-curriculum-related student clubs; and

WHEREAS, we have received an application from a group of our high school students for approval of the formation of a student Christian religious club; and

WHEREAS, it is the adopted written policy and past practice of the District that all students should be permitted to participate in and have access to all student clubs on an equal basis and to the fullest extent as they may choose, regardless of their race, color, creed, sex, national origin, religion, age, marital status or disability; and

WHEREAS, discrimination by a student club which limits a student's full participation in club activities because of the student's creed or religious beliefs would be detrimental to the education, welfare and well-being of the students attending the District's schools.

NOW, THEREFORE, BE IT RESOLVED that we hereby approve the formation of said high school student Christian religious club on the following conditions:

1. Membership in the Club shall be limited to Roslyn High School students, and no student shall be discriminated against or excluded from participating in or having access to the Club, including without limitation entitlement to be an officer of the Club, on the basis of creed or religion.

2. A Roslyn faculty member shall be assigned as a monitor to the Club in a nonparticipatory capacity only.

3. Non-school persons may not direct, conduct, control or regularly attend activities of said Club.

4. The Club shall be allowed to meet on school premises, but only during nonschool hours.

5. In accordance with the Federal Equal Access Act, no public funds will be expended to support the Club or its activities beyond the incidental cost of providing meeting space and compensation for a monitor.

IT IS HEREBY FURTHER RESOLVED that the Superintendent of Schools is hereby directed to cause all listings, communications and announcements issued by the District pertaining to said Club expressly to state that the Roslyn School District does not endorse the Club, but is mandated by the Federal Equal Access Act to permit the Club's activities, same to be on a voluntary basis and to be held on school premises during non-school hours only.